🔥 **EFILED IN OFFICE**
CLERK OF STATE COURT
RICHMOND COUNTY, GEORGIA
**2024RCSC01036**
**ASHANTI L. POUNDS**
AUG 05, 2024 04:57 PM

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

## IN THE STATE COURT OF RICHMOND COUNTY

## STATE OF GEORGIA

SISTER CITY LOGISTICS, INC.,

      Plaintiff,

vs.

JOHN FITZGERALD,

      Defendant.

CIVIL ACTION FILE NO: _____

## COMPLAINT FOR DAMAGES AND JURY DEMAND

**COMES NOW**, Plaintiff, Sister City Logistics, Inc. ("Plaintiff") hereby files its Complaint for Damages and Jury Trial against, John Fitzgerald ("Defendant"), and respectfully shows the Court as follows:

### PARTIES AND JURISDICTION

1. Plaintiff is a corporation that has its headquarters and principal place of business in Augusta, Richmond County, GA. Deidre Scott (Scott) is President of Plaintiff. Venue and jurisdiction are proper as to Plaintiff.

2. Defendant resides at 347 Bella Rose Drive, Evans, Columbia County, GA 30809. Defendant's place of employment is located at 2002 International Drive, Augusta, Richmond County, GA, 30906. Jurisdiction and venue are

proper as to defendant as all actions that give rise to this suit occurred at Defendant's place of employment. Defendant can be served at his place of employment.

3. The State Court of Richmond County is the proper venue in this action. This Court has jurisdiction over this matter pursuant to O.C.G.A. § 9-10-91. Venue is proper in Richmond County pursuant to O.C.G.A. § 14-2-510(b) because the Defendant works in this County.

## BACKGROUND

4. Plaintiff, Sister City Logistics, Inc. ("Plaintiff"), is an Independent Service Provider (ISP) for FedEx Ground Package System, Inc. ("FedEx").

5. FedEx's contracts with Independent Service Providers (ISPs) are referred to as Independent Service Contractor Agreements (ISPAs).

6. Plaintiff entered into a contractual relationship with FedEx to provide delivery services within a specific Contracted Service Area (CSA) in September 2022.

7. ISPAs define the contracted Service Areas (CSAs) where the ISPs pick up and deliver packages on behalf of FedEx.

8. Plaintiff's entire revenue was derived from contracts to service CSAs with FedEx.

9. CSAs are composed of multiple "Routes", a colloquial reference for these service routes in service areas.

10. CSAs often correspond to Zip Codes or combinations of Zip Codes.

11. CSAs have different values based on the purported revenue generating potential of each CSA.

12. Revenue potential projections are provided by FedEx to ISPs during annual negotiations, in information packets provided online.

13. Plaintiff owned and operated FedEx delivery routes that dispatched out of FedEx Stations located in Augusta, Georgia.

14. Plaintiff's CSA for its 2022 contract with FedEx was to deliver packages to and pick up packages from residences and businesses serviced by FedEx in partial zip code 30907.

15. In 2022, Plaintiff's revenue projections were approximately between $650,000 - $700,000.

16. In September of 2023, Plaintiff purchased an additional CSA from Scott's father, servicing partial zip code 30909.

17. Plaintiff's contract with FedEx executed in September 2023 was to deliver packages to and pick up packages from residences and businesses serviced by FedEx in partial Zip Codes 30907 and 30909.

18. In 2023, Plaintiff's revenue projections were approximately between $1,400,000 and $1,500,000.

19. In 2024, Plaintiff's revenue projections were approximately between $1,250,000 and $1,320,000.

20. Plaintiff employs drivers to deliver packages on behalf of FedEx.

21. The FedEx Station (terminal) is primarily staffed by FedEx Ground employees.

22. Station staffing typically includes Station Managers (also referred to as "Senior Managers"), Sort Managers, and Package and Delivery Managers (P&D Managers).

23. Senior Managers, Sort Managers, and P&D Managers directly interface with FedEx ISPs.

24. Other FedEx employees at Stations include employees that engage in the processing, sorting, and loading of packages on and off of Line Haul Trailers, and ISP vehicles coming in and out of the FedEx Stations.

25. FedEx has a department dedicated to ISP relations, named Business Development Services (BDS).

26. BDS is staffed with Business Development Managers and other employees.

27. Along with recruiting and onboarding new ISPs, BDS Managers are directly involved in the CSA assignment and ISPA execution process, along with Senior Managers.

28. Business Development Managers operate at regional levels and work across multiple FedEx Terminals.

29. The Business Development Manager for the Plaintiff at both 309 and 249, is William Clark (Clark).

## RELOCATION TO TERMINAL STATION 249

30. Defendant was responsible for the performance metrics associated with Terminal Station 249 ("249"), which include performance metrics for the station and its employees, as well as the performance metrics for the ISPs dispatching from 249.

31. FedEx Senior Managers have both published performance metrics that are used to judge performance of the Station as a whole, as well as "Ghost Metrics" that are used to evaluate performance and continued contracting decisions.

32. Ghost Metrics are not shared with the ISPs.

33. Defendant had wide latitude in the management and treatment of the ISPs, including the ability to take action that can set up ISPs for termination or non-renewal of their ISPAs.

34. Plaintiff began its operations under Defendant"s oversight at Terminal Station 309 ("309") in September 2022.

35. On or around October 2022, Defendant relocated to Terminal Station 249 ("249").

36. In April 2023, Plaintiff relocated from 309 under the oversight of Senior Manager Kenneth Frazier, to 249, under the oversight of Defendant.

37. Throughout its tenure at Terminal Station 249, Plaintiff encountered numerous operational challenges.

38. Under the direction of the Defendant, it was common practice for FedEx staff to override the Plaintiffs Package codes.

39. These codes are directly related to the ISPs performance metrics and can both affect compensation to the ISP as well as set them up for failure. Coding Overrides can prevent an ISP from meeting their performance requirements under the ISPA, setting them up for termination or nonrenewal of the ISPA.

40. One common override is Code #27 ("Did Not Attempt) which was applied by FedEx staff at the direction of the Defendant.

41. At the direction of the Defendant, Code #27s were applied to Plaintiff's packages during holidays or weather events where delivery may have been attempted, but the location was either closed or impossible to reach, amongst other reasons that are outside of the control of the ISP.

42. On May 8, 2024, a FedEx 249 employee advised Scott that at the direction of the Defendant she was told to code all packages of the Plaintiffs as 27s. The packages had not been presented to the Plaintiff, nor its drivers.

43. On May 20, 2024, a FedEx 249 employee advised Scott that at the direct request of the Defendant she was advised to code all present packages of the Plaintiffs as 27s. This employee communicated that the packages had been previously coded a 94, as they had not been presented to the Plaintiff, nor its drivers.

44. This FedEx employee advised she communicated this to the Defendant. The Defendant acknowledged that the packages had not been presented to the Plaintiff nor its drivers, however still advised her to use the punitive Code #27.

45. The Plaintiff made continuous efforts to address issues with unfair treatment from the Defendant and under his management, through formal business discussions and informal conversations with Defendant and other FedEx managers, including Clark. Despite these communications, Plaintiff's challenges persisted.

46. On multiple occasions, Defendant communicated inaccurate data regarding Plaintiff's operations to FedEx district managers and staff, presenting Plaintiff in an unfavorable light.

## MAY 8TH RIGHT TO ENSURE

47. On or around May 4, 2024, Plaintiff listed business for sale.

48. On May 8, 2024, A call was placed out to the agents of Lambert Logistics to notify them that the terminal was short staffed on loaders, and advised to have their drivers come in early.

49. On May 8, 2024, No agents of the Plaintiff were called to be made aware of short staffing.

50. On May 8, 2024, hundreds of packages were left unloaded by FedEx staff at the time of scheduled dispatch (9:45 AM).

51. On May 8, 2024, the Defendant was made aware that hundreds of packages assigned to the Plaintiff's routes, were left on the floor, unloaded by FedEx staff.

52. On or around May 8, 2024, Defendant communicated with P&D Manager, Justin Williams (Williams), a subordinate to the Defendant, and other subordinates about an alleged failure of Route 2117 to dispatch.

53. On May 8, 2024, Defendant was told by FedEx employees, and agents of the Plaintiff that Route 2117 had indeed been dispatched.

54. On May 8, 2024, Defendant falsely claimed that Justin Williams' was unable to reach agents of Plaintiff.

55. On May 8, 2024, Through call logs, it was proven to the Defendant that communications to Justin Willaims were returned within five minutes.

56. On May 8, 2024, Defendant continued to communicate that Route 2117 did not dispatch on that day, despite having ready access to information that would have shown otherwise.

57. Defendant communicated this through at least June 4th, 2024.

58. On May 8, 2024, Defendant issued a Right to Ensure service.

59. A Right to Ensure is a contractual remedy that allows FedEx to reassign a portion of an ISP's CSA to another party, a process commonly referred to as flexing volume.

60. On May 8, 2024, the Defendant cited a failure to communicate and the failure of Route 2117 to dispatch as reasons for issuing the Right to Ensure in an email.

61. On May 8, 2024, At the time of the email the Defendant was aware that Route 2117 had dispatched, and knowingly communicated these false claims.

62. On May 8th, 2024, the Defendant falsely communicated to FedEx's management that Route 2117 had not been dispatched, despite internal logs showing the route had been dispatched. This misinformation led to a Right to Ensure service being issued against Plaintiff, directly causing financial penalties and gaming Plaintiff's reputation with FedEx.

63. On or around May 8th, 2024, Scott communicated to Defendant and Clark, instances of Discrimination, including the unequal allocation of resources to support Plaintiff.

## ATTEMPT TO DESTABILIZE COMPANY

64. Prior to issuing the Right to Ensure, flexing volume to a neighboring company, the Defendant reached out to Mission Logistics, a company whose CSA is contiguous with the Plaintiff's.

65. Mission Logistics has made several attempts to destabilize the Plaintiff's company, by attempting to pirate drivers.

66. On or around May 2023, Scott reached out to the Defendant and notified him of concerns regarding attempts from Mission Logistics to destabilize the

Plaintiff's business, stating Kevin had voiced interest in acquiring Plaintiff's CSA for free.

67. On June 5, 2023, Plaintiff again notified the Defendant of Mission Logistics attempts to destabilize her company by again targeting her driver team.

68. On or around May 8, 2024, Defendant shared confidential information regarding Plaintiff's CSA realignment information regarding zip code 30907 with contractor Kevin Toelle of Mission Logistics, prior to later disclosing it to Scott on June 4, 2024.

69. On or around May 17, 2024, Scott communicated to Justin Williams and other terminal management frustration with continued acts of discrimination at the hands of the Defendant, specifically the unfair application and unequal application of rules on her business versus male counterparts.

70. Scott showed Williams photographic evidence of trucks being dispatched with egregious levels of body damage. As well as evidence of unequal distribution of terminal resources.

## NETWORK 2.0 FORUM

71. On or around March 25th, 2024, Defendant notified Plaintiff of a Station wide terminal forum scheduled for April 2, 2024. The forum would discuss the merger of FedEx's Ground and Express operations, commonly known as Network 2.0. This forum was canceled and rescheduled for June 4th, 2024.

72. On or around May 4, 2024, Plaintiff listed its business for sale.

73. Scott listed the Plaintiff's CSA for sale before receiving 2023 revenue projections.

74. On May 16, 2024 Network 2.0 Information Packet was prepared for Plaintiff, this was disbursed on June 4th, 2024. This packet included details on Station Service Area, Optimized CSA, Potential Service Demands and Volume, Station Operational Changes and Transition incentives.

75. On or around June 4, 2024, During a station-wide forum at 249, Defendant and other senior staff informed Plaintiff and other ISPs about FedEx's intention to end current ISP contracts as of August 16, 2024, due to Network 2.0.

76. On June 4, 2024, Following the forum, Scott met with Defendant, Clark and FedEx representative Bryce Newton to discuss Network 2.0. At this time Scott was provided with the Network 2.0 Information Packet prepared May 16th, 2024.

77. Prior to the Plaintiff's scheduled breakout meeting with the Defendant, Clark, and Bryce Newton, the Defendant, in an open bay of cubicles, discussed the relocation of zip code 30907 from Plaintiff's area with Casey Lambert.

78. Casey Lambert is the Authorized Officer of Lambert Logistics, another ISP.

79. The area being reassigned was viewed on Steven Brunson's computer, at the request of the Defendant.

80. On or around June 4, 2024, During this meeting, Scott raised concerns about discriminatory actions from the Defendant to the Defendant, Clark and Byrce Newton. Citing specific instances of discrimination to include the sharing of confidential information with competitors, as well as unequal distribution of resources, and other actions of the Defendant.

81. On or around June 4, 2024, During this meeting, Scott advised Clark that she was still under a RTE.

82. Clark, in the presence of Defendant, Newton and Scott, advised that he was not aware of this, specifically asking the Defendant why.

83. The Defendant became visibly upset, and refused to provide an explanation in the meeting with Scott, Newton and Clark.

84. On or around June 4, 2024, Additional conversations about Scott's claims occurred between Defendant, Clark, and Newton.

85. On or around June 4, 2024, During this meeting, Scott inquired about the process of selling her business.

## NON-EXCLUSIVE NEGOTIATIONS

86. On or around June 5, 2024, An undefined service area listing for Augusta, Georgia, was posted on BuildaGroundBiz.com.

87. On or around June 5, 2024, Scott attempted to contact Clark to discuss the listing that had been sent out to the BuildaGroundBiz.com email alert list.

88. On or around June 5, 2024, Scott sent a text message to Clark regarding the undefined listing. "Is this for the CSA I am currently fulfilling? I was under the impression it would be listed in July. During the actual negotiation period."

89. On or around June 5, 2024, Defendant advised that Plaintiff would need to submit a new Request for Information, as well as interview in an AIM Meeting for CSA. Defendant communicated to Plaintiff that he would provide details in the future on next steps to be considered for negotiations for CSA 308002.

90. On or around June 5, 2024, Scott forwarded Clark pictures of her trucks intentionally not being loaded at the direction of the Defendant.

91. On or around June 6, 2024, Scott was advised that the listing on BuildAGroundBiz.com was a general listing and that applicants would be considered for all CSAs under non-exclusive negotiation, not the Plaintiff's specific CSA.

92. In this call, Scott asked Clark how to be considered for CSA 308002, in which he advised that the Defendant would provide the details for candidates at 249.

93. Between June 5, 2024 and June 18, 2024, Defendant never provided details on how to be considered for negotiations under Network 2.0. Allowing the listing to close without the Plaintiff being able to submit their information.

94. Defendant was the only person at 249 who could provide this information.

95. On or around June 18, 2024, Scott communicated concerns of discriminatory actions to Clark, specifically exclusion from being considered for Network 2.0 contracting. Citing she had not received any further direction from the Defendant on how to be considered.

96. On or around June 18, 2024, Clark advised Scott that the window to submit the RFI had closed.

97. Clark expressed disappointment that the Defendant had not properly provided the necessary information to Scott.

98. On June 19, 2024, Plaintiff received its first communication regarding the application process for Network 2.0 contracting.

99. Plaintiff was advised to submit an electronic Request for Information (RFI) Response for ISP-24-06-04-0249-001 (undefined opportunity), from Brenda Ruiz (Ruiz), FedEx employee in Business Development Services and Clark.

100. On June 19, 2024, Plaintiff submitted its Request for Information.

101. On June 19, 2024, Ruiz confirmed receipt of Request for Information.

102. July 1st, Scott completed the RTFE (Rate The Facility Experience) Survey, providing feedback on experiences at 249, and with the Defendant. In this survey Scott cited ongoing issues with the Defendant.

## INCENTIVE AGREEMENT

103.  Network 2.0 Information Packet provided June 4, 2024, included Confidential Phased Incentive Amendment to ISP Agreement for Non-Exclusive Negotiation and Limited Release (Incentive Agreement).

104.  Scott was advised that to enter negotiations for CSA 308002 in Network 2.0, Plaintiff was required to execute the Incentive Agreement.

105.  On or around June 18, 2024, Scott was advised by Clark that Plaintiff was on a weekly report that was being generated citing all ISPs from Terminal 249 who had not signed the Incentive Agreement.

106.  At this time, Scott was informed that candidates who did not sign the Incentive Agreement, which included a limited release, could not be considered for contracting in Network 2.0.

107.  On or around June 19, 2024, Scott executed the Incentive Agreement in order to be considered for Network 2.0 contracting.

108.  By signing the Incentive Agreement, Plaintiff's contract termination date was moved up to August 16, 2024.

## FEDEX CONTRACTING PROCESS

109.  The FedEx contracting process involves several steps of onboarding and orientation.

110.  First, a candidate must submit a RFI.

111.  Candidates selected from their RFI applicant pool, then go through an "AIM Meeting" with the Senior Manager and BDS Manager.

112.   Between the conclusion of the AIM Meeting and the ultimate assignment of the ISPA from the previous ISP to the new ISP, the new ISP is in regular communication with the FedEx Senior Manager to complete the many additional requirements to get started.

113.   This includes setting up their CSP profile, signing the initial compliance documents, getting cleared through First Advantage, and the assignment being processed and approved through FedEx's internal systems.

114.   In theory BDS is an integral part of the FedEx system for selecting and executing the assignment of CSAs and the ISPA.

115.   In actual practice, whether the assignment (either to buy or sell routes) is approved depends entirely on the approval of the Stations Senior Manager.

116.   ISPAs generally are for terms ranging between 12 to 18 months.

117.   Typically the renewal process for the ISPA begins 6 months prior to contract termination.

## NON-EXCLUSIVE NEGOTIATIONS

118.   Between June 5, 2024 - July 12, 2024, Defendant reviewed multiple proposals and met with applicants for ISP-24-06-04-0249-001 (undefined opportunity) operating out of 249.

119.   On or around June 14, 2024, Plaintiff was scheduled for a mandatory Business to Business Meeting on June 20, 2024, with a team that specialized in the roll out for Network 2.0.

120.   On or around June 20, 2024, Plaintiff met with a specialized team in FedEx focused on Network 2.0 roll out. This meeting lasted over two hours, and was focused on preparing for Network 2.0 rollout in CSA 308002.

121.   Between June 19, 2024 and July 26, 2024, no agents of the Plaintiff were ever brought in for an AIM Meeting.

122.   As of July 9th, 2024, all other ISPs in Terminal 249 had received communication from the FedEx negotiation team, with the exclusion of Plaintiff.

123.   On or around July 9, 2024, Scott communicated concern that she had not received a re-negotiation request, and wanted to know the next steps for transition. The Defendant initially attributed this to a profile error on the Plaintiff's part. It was later determined that this was not accurate.

124.   On or around July 9, 2024, Scott communicated to Defendant concerns that Defendant was not truly considering the Plaintiff, and was not acting in good faith.

125.   On or around July 9, 2024, Scott expressly asked Defendant if Plaintiff would be considered for the CSA, advising if not, she would seek legal remedies.

126.   On or around July 9, 2024, the Defendant, on a call with Scott, expressed assurances to Scott that the district's intention was for Plaintiff to service CSA 308002 under Network 2.0.

127. On July 12, 2024, Scott received first communication from FedEx Negotiator, Timothy Hillock (Hillock).

## REQUEST TO PREPARE FOR NETWORK 2.0

128. On June 22, 2024, At the request of the Defendant, agents of the Plaintiff attended a meet and greet at Station 249 to interview and onboard potential hires from FedEx's Express Operations.

129. On or around June 25, 2024; Scott met with Defendant in his office at Terminal 249.

130. During this meeting some of the topics discussed included, but were not limited to, Network 2.0, Zip Code 30904, Scott wanting to move forward in a positive relationship with the Defendant, and Scott wanting an opportunity to be successful.

131. During this meeting, Scott was brought to tears as she revisited issues with resource allocation, not being provided details for RFI submission in a timely fashion, and specific preferential treatment of male counterparts.

132. CSS is a team of FedEx employees who assists Terminals with the transition into Network 2.0.

133. On July 1, 2024, Scott was notified by Williams that CSS would like to do a follow up meeting to view Scott's progress on creating route plans for CSA 308002 via Webex/Zoom on July 16, 2024.

134. This meeting was later rescheduled to July 15, 2024.

135. From July 5, 2024 through July 26, 2024, and beyond, at the direction of the Defendant, the Plaintiff received communications from the station requesting continued updates on preparing drivers for certifications required for Network 2.0.

136. On and around July 9, 2024, After communication with the Defendant, Plaintiff continued a concerted effort to hire more drivers, and acquire additional vehicles. Plaintiff also increased efforts to get current drivers the additional certification required in Network 2.0.

137. On July 15, 2024, Scott had a meeting with Terminal 249 P&D Managers, and three members of CSS, assisting in the successful implementation of Network 2.0 changes at 249. This meeting discussed Plaintiff's preparedness and readiness for Network 2.0.

138. In anticipation of this meeting, Plaintiff dedicated monetary resources and hours of time to the development of comprehensive route plans and anchor areas for CSA 308002.

139. On July 16, 2024, Defendant sent communication advising the agent of Plaintiff to attend a July 25, 2024 forum regarding Network 2.0.

140. On July 25, 2024, Agent of the Plaintiff attended Network 2.0 Forum.

141. On July 25, 2024, Scott had a conversation with Defendant regarding plans for CSA 308002, specifically Designer Shoe Warehouse (better known as DSW) and Zip Code 30904.

## **DEFENDANT'S COLLUSION WITH MARLON CAMPBELL**

142.   On July 2, 2024, Marlon Campbell (Campbell), an ISP from another state, expressed an interest in purchasing FedEx delivery routes in Augusta, Georgia.

143.   On or around July 22, 2024, Scott communicated continued concerns of fairness in the application process to Clark citing beliefs that it was Defendant's intention not to consider Plaintiff.

144.   On or around July 22, 2024, Plaintiff brought to Clark's attention social media posts that were breaches of Campbell's contractual confidentiality clauses with FedEx.

145.   On or around July 22, 2024, Defendant advised Campbell to delete and / or limit audiences on social media posts that were breaches of Campbell's contractual confidentiality clauses with FedEx.

146.   On or around July 22, 2024, Campbell posted a job ad on Indeed for drivers for an Augusta, Georgia CSA, dispatching from Terminal Station 249, with descriptions closely resembling Plaintiff's CSA.

147.   Campbell's ad noted his ownership of the CSA, indicating it had been awarded. Specifically stating "I have dense areas where you can do 175 plus stops per day."

148. On or around July 22, 2024, Plaintiff received a counter offer from FedEx, for CSA 308002 negotiations that was higher than the offer Plaintiff submitted July 19, 2024.

149. On July 22, 2024, Hillock advised Scott that on Friday July 26, 2024 is when the Defendant will be notified of which candidates FedEx reached tentative acceptance with.

150. Hillock advised Scott that the Defendant would choose who the contract was assigned to.

151. On July 23, 2024, Plaintiff accepted the offer from FedEx, entering tentative acceptance status.

## NONRENEWAL OF CONTRACT

152. The Senior Manager has the power to recommend contracts for termination to a review board. This recommendation will come if the ISP did not cure a breach of the ISPA or if the manager believes ISP did something illegal and/or violated the integrity clause. The recommendation from the Senior Manager goes to a district manager, who then decides whether or not to send it to a legal review at FedEx's corporate offices. The legal review generates a recommendation, and the district manager makes the final decision about whether or not to terminate a contract.

153. The termination review board meets twice a month to deliberate the legal exposure of each contract termination.

154. Only about 20% of all recommended contracts are actually approved for termination by the review board.

155. It is a standard process for terminated ISP contracts to go through termination review, if being terminated.

156. If FedEx elects to terminate a contract, they will typically give the contractor 30 days to sell the business. They are likely to extend this time frame if the ISP makes good faith efforts to reassign the routes.

157. On July 26, 2024, Defendant informed Plaintiff that the plaintiff's contract with FedEx would not be renewed.

158. On July 26, 2024, Scott was advised by Clark that he was not aware that Defendant had not previously notified Plaintiff that FedEx was not considering moving forward with contracting with Plaintiff in Network 2.0 prior to negotiations.

159. On July 26, 2024, Scott was advised by Clark that the decision to not consider Plaintiff was made by the Defendant.

160. On July 26, 2024, Plaintiff was advised by Clark that previous to the week of July 26th, 2024, the Defendant communicated to FedEx district employees that he intended to select Campbell for CSA 308002.

161. On July 26, 2024, Plaintiff was advised by Clark that AIM meetings had been completed weeks in advance to negotiations, and that the district was under the impression that the Defendant had notified Plaintiff that FedEx

was not moving forward with contracting with Plaintiff in Network 2.0 to provide the Plaintiff time to transition, and make plans regarding sales of the business and sale of assets.

162.   On July 26, 2024, Scott informed Clark that, in light of the details and the clear intent to deceive her, she would pursue legal action against the Defendant.

163.   On July 30, 2024, Scott contacted Clark to discuss transition steps. During this conversation, Scott reiterated that the Plaintiff was pursuing legal action against the Defendant in his personal capacity, due to the Defendant's intentionally deceitful and misleading conduct. Clark acknowledged this and confirmed that he understood Scott's actions to address the Defendant's conduct.

## CONCLUSION

164.   Plaintiff's operations were subjected to differential treatment under Plaintiff's supervision, with Defendant's actions causing significant operational hurdles and unfair competitive disadvantages.

165.   Defendant enforced inconsistent policies and imposed stricter performance standards against Plaintiff compared to other contractors, particularly male counterparts.

166.   Defendant through unreasonable, unlawful, discriminatory and retaliatory processes:

    a.  Prevented the Plaintiff from operating its routes,

    b.  Prevented plaintiff from selling their routes to qualified purchasers,

    c.  Falsified performance numbers in order to set up Plaintiff to not be considered for contracting in Network 2.0,

    d.  Delayed advising the Plaintiff that they would not be considered in Network 2.0

    e.  Did not consider the Plaintiff for contracting in Network 2.0

    f.  Took egregious actions to undermine, sabotage , destroy and ultimately confiscate Plaintiff's business.

## CAUSES OF ACTION

Count I: Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing

167.  The Plaintiff entered into a contract with FedEx in 2022 to provide delivery services within specific Contracted Service Areas (CSAs). The contract stipulated that Plaintiff's entire revenue would be derived from these contracts. Defendant, in his capacity as a representative of FedEx, was responsible for overseeing operations at Terminal Station 249 and ensuring compliance with the contract's terms.

168.  The Defendant breached the contract by providing inaccurate data about Plaintiff's operations. This false data, including claims about the dispatch

status of Route 2117 and other performance issues, was communicated to FedEx district managers and staff, presenting Plaintiff in an unfavorable light. These inaccuracies directly impacted Plaintiff's performance evaluations and contractual standing with FedEx.

169. The Defendant also failed to provide necessary information and support for Plaintiff's participation in Network 2.0. Specifically, the Defendant did not provide details on how to be considered for Network 2.0 and withheld critical information necessary for Plaintiff to submit a timely Request for Information (RFI). This lack of support prevented Plaintiff from effectively participating in the new contracting process.

170. The Defendant breached the implied covenant of good faith and fair dealing by consistently providing false data about Plaintiff's operations and failing to support Plaintiff in Network 2.0 contracting. These actions included:

   a. Knowingly providing inaccurate data to FedEx district managers, negatively impacting Plaintiff's performance evaluations.

   b. Failing to provide necessary information for Network 2.0 contracting, thereby hindering Plaintiff's ability to compete fairly.

   c. Misleading Plaintiff into believing it would be considered for Network 2.0 contracting while communicating to the district that Plaintiff would not be considered.

171.   Under the Defendant's oversight, Plaintiff faced numerous operational challenges, including the unfair application of rules and unequal allocation of resources compared to other contractors. This differential treatment placed Plaintiff at a competitive disadvantage.

172.   As a direct result of the Defendant's actions, Plaintiff suffered significant financial losses and damage to its business reputation. The non-renewal of Plaintiff's contract with FedEx and the unauthorized disclosure of confidential information further compounded these issues, leading to a competitive disadvantage.

173.   The Defendant's actions resulted in significant operational disruptions for Plaintiff, including difficulties in managing day-to-day operations and unfair competitive disadvantages. Furthermore, the Plaintiff was not given a fair opportunity to sell the company due to the Defendant's misconduct. As a result, the business was rendered worthless, causing severe financial harm to the Plaintiff.

174.   The Defendant's actions constitute a breach of contract and a breach of the implied covenant of good faith and fair dealing. These actions led to substantial financial and reputational harm to Plaintiff, operational disruptions, and ultimately rendered the business worthless. The Plaintiff seeks compensatory damages, punitive damages, litigation costs, and any other relief deemed just and proper by the Court.

Count II: Tortious Interference with Contractual Relations

175.    The Plaintiff had a valid and enforceable contractual relationship with FedEx to deliver packages within specified Contracted Service Areas (CSAs). This relationship was essential to Plaintiff's business operations and revenue.

176.    The Defendant intentionally provided false information about Plaintiff's operations to FedEx management. This included incorrect data on the dispatch status of Route 2117 and other performance issues. Such misinformation harmed Plaintiff's standing with FedEx, undermining its performance evaluations and contractual stability.

177.    The Defendant failed to provide Plaintiff with critical information necessary for participation in contracting under Network 2.0. Specifically, the Defendant did not give directions on how to participate in the new contracting process and withheld essential details needed for Plaintiff to submit a timely Request for Information (RFI). This failure led to Plaintiff being excluded from consideration for Network 2.0 contracting.

178.    The Defendant intentionally caused route failures by restricting resources needed for loading and by supporting discriminatory actions taken by other members of management. These actions were designed to disrupt Plaintiff's operations and create significant operational difficulties.

179.  As a result of the Defendant's interference, Plaintiff faced continuous operational challenges and differential treatment compared to other contractors. The unfair practices led to increased staff turnover, frequent route failures, and an overall decline in operational efficiency. These issues were directly linked to the Defendant's intentional actions and support for discriminatory practices.

180.  The Defendant's interference contributed to Plaintiff's exclusion from being considered for Network 2.0 contracting. By withholding critical information and providing false data, the Defendant ensured that Plaintiff could not compete fairly for new contracts. This exclusion resulted in significant financial losses and damage to Plaintiff's business reputation.

181.  Due to the Defendant's tortious interference, Plaintiff suffered substantial financial losses and damage to its business. The exclusion from Network 2.0 contracts, combined with the operational difficulties caused by the Defendant's actions, led to a decline in revenue and business stability.

182.  The Defendant's intentional and malicious actions constitute tortious interference with Plaintiff's contractual relations with FedEx. These actions led to significant financial and operational harm to Plaintiff, preventing it from effectively competing for Network 2.0 contracts and maintaining its business operations.

Count III: Fraud

183.  The Defendant intentionally provided false and inaccurate information regarding critical operational matters essential to the business of the Plaintiff. These misrepresentations included false claims about the dispatch status of Route 2117 and other vital performance metrics.

184.  The Defendant falsely reported that Route 2117 had not been dispatched, despite having access to the correct information. Internal logs clearly indicated that the route was indeed dispatched. These inaccuracies were communicated to FedEx management, thereby presenting Plaintiff in an unfavorable light and impacting its performance evaluations.

185.  The Defendant made specific promises about the continuation of Plaintiff's contract and service area, knowing these assurances to be untrue. These fraudulent assurances were pivotal to Plaintiff's business decisions, as they influenced the company's strategic planning and operational commitments.

186.  In his oversight role, the Defendant had a duty of care to provide sufficient resources and accurate information to ensure the Plaintiff's successful operations. This duty included ensuring smooth operations and proper management through the provision of truthful and reliable information.

187.  The Defendant acted with the intent to deceive both Plaintiff and FedEx district management. The deception was intended to harm Plaintiff's

business, portray it negatively, and undermine its contractual relationships. This intent was further demonstrated through actions such as:

    a. Exclusion of Plaintiff from critical meetings.

    b. Dishonest communications.

    c. Solicitation of work product under false pretenses.

188. Plaintiff reasonably relied on the Defendant's false statements and assurances, leading to significant operational issues and financial losses. Specifically, Plaintiff refrained from selling the business based on the Defendant's fraudulent assurances. When these assurances were not honored, the business became worthless. This reliance directly impacted Plaintiff's business decisions and reputation.

189. The Defendant's false statements concerned material facts crucial to Plaintiff's business decisions. These statements significantly impacted Plaintiff's operations and financial stability, as Plaintiff's reliance on them led to strategic missteps and operational disruptions.

190. As a result of the Defendant's fraudulent misrepresentations, Plaintiff suffered substantial financial harm and damage to its business operations. The inaccurate information provided by the Defendant directly affected Plaintiff's business decisions and reputation, causing significant damages. Specifically, Plaintiff incurred financial penalties and reputational harm due

to reliance on false information about the dispatch status of Route 2117 and other operational matters.

191.    The Defendant falsely represented that Plaintiff would be the contracted party in Network 2.0. These statements were made with no intention of ever contracting with Plaintiff. Furthermore, the Defendant continued to mislead Plaintiff by advising that they would be informed of the process, while knowing that more than ten other applicants were being considered without notifying Plaintiff.

192.    The Plaintiff justifiably relied on the Defendant's false statements and assurances, which was the proximate cause of the Plaintiff's damages. This reliance prevented Plaintiff from seeking other opportunities, leading to financial losses and missed business prospects. The Plaintiff suffered significant financial harm and business setbacks due to the Defendant's fraudulent misrepresentations, which affected the Plaintiff's business decisions and future planning.

193.    The Defendant's actions constitute fraud, as they involved intentional misrepresentations and false assurances designed to deceive Plaintiff. These actions led to substantial financial harm, operational damage, and reputational harm for Plaintiff.

Count IV: Retaliation

194. Scott, as a female business owner, belongs to a protected class. Both she and her company, Sister City Logistics Inc. (Plaintiff), engaged in protected activities by reporting discriminatory actions and unequal treatment to the Defendant, and other FedEx managers.

195. The Defendant engaged in actions that created a hostile environment and subjected Plaintiff to differential treatment based on gender. Specific conduct included:

   a. Unequal Allocation of Resources: Allocating fewer resources to support Plaintiff compared to other contractors.

   b. Unfair Application of Rules: Imposing stricter performance standards on Plaintiff compared to male-owned businesses.

   c. Derogatory Remarks: Making derogatory remarks about Plaintiff and Scott.

   d. Operational Hindrances: Providing fewer resources to Plaintiff, adversely affecting its operations.

196. Following reports of discrimination by Scott and Plaintiff, the Defendant engaged in retaliatory actions, including:

   a. Exclusion from Network 2.0 Contracting Excluding Plaintiff from contracting under Network 2.0.

b.  Operational   Challenges:   Imposing   operational   challenges   by withholding  critical  information  and  failing  to  provide  necessary support.

197.  As  a  result  of  the  Defendant's  discriminatory  and  retaliatory  conduct, Plaintiff and Scott experienced significant adverse actions, including:

a.  Financial  Harm:  Plaintiff  faced  financial  harm  due  to  stricter performance standards and fewer resources.

b.  Reputational  Damage:  Plaintiff  and  Scott  suffered  reputational damage  from  derogatory  remarks  and  exclusion  from  critical negotiations.

c.  Operational Disruptions: Plaintiff experienced operational disruptions due to withheld information and lack of necessary support.

d.  Emotional Distress: Scott suffered emotional distress as a result of the hostile work environment and retaliatory actions

198.  These  actions  caused  Plaintiff  substantial  financial  losses,  exacerbated operational challenges, and inflicted significant reputational harm.

199.  There  is  a  direct  causal  connection  between  the  Defendant's discriminatory conduct and the adverse actions taken against Plaintiff and Scott  following  their  reports  of  discrimination.  The  retaliatory  measures intensified  the  business  and  personal  challenges  faced  by  Scott  and  her company.

200. On June 4, 2024, after Scott reported discriminatory treatment to the Defendant, Plaintiff was excluded from the Network 2.0 contracting. The Defendant provided no information on the application process, despite other Independent Service Providers (ISPs) receiving this information, which demonstrates retaliatory intent.

201. The Defendant's actions constitute retaliation, as they involved creating a hostile work environment, differential treatment based on gender, and retaliatory measures following reports of discrimination. These actions led to significant financial, operational, and emotional harm to Plaintiff and Scott.

Count V: Breach of Confidentiality

202. The Plaintiff provided confidential information regarding its Contracted Service Area (CSA) realignment and other critical business operations to the Defendant. This information was disclosed with the expectation that it would be kept confidential and not shared with unauthorized parties.

203. The Defendant breached this expectation by diPlaintiffosing the confidential information to a competitor, Kevin Toelle of Mission Logistics, before informing Plaintiff. This unauthorized disclosure provided the competitor with an unfair advantage, allowing them to use the sensitive information to benefit their own business operations at the expense of Plaintiff.

204. The unauthorized disclosure of confidential information resulted in significant competitive disadvantages and financial losses for Plaintiff. The competitor, Mission Logistics, utilized the disclosed information to gain a business advantage, directly harming Plaintiff's market position and operational effectiveness.

205. The Defendant's actions constitute a breach of confidentiality, as they involved the unauthorized disclosure of sensitive business information to a competitor, resulting in competitive disadvantages and financial harm to Plaintiff.

Count VI: Unfair Competition

206. The Defendant engaged in actions that undermined the operations of the Plaintiff and favored other contractors, thereby creating unfair competitive disadvantages for Plaintiff. These actions included, but were not limited to, providing inaccurate data about Plaintiff's operations, withholding critical information necessary for business operations, and showing preferential treatment to competing contractors.

207. The Defendant's actions were intentionally designed to harm Plaintiff's competitive position. By disseminating false information, withholding essential data, and favoring competitors, the Defendant caused significant financial losses and operational challenges for Plaintiff. These actions were

carried out with the specific intent to diminish Plaintiff's market position and to advantage other contractors unjustly.

208. Examples of Unfair Practices:

    a. The Defendant provided false data regarding the dispatch status of Plaintiff's routes, which negatively impacted Plaintiff's performance metrics and reputation with FedEx.

    b. Critical information required for Plaintiff's participation in Network 2.0 contracting was deliberately withheld by the Defendant, preventing Plaintiff from competing fairly for new contracts.

    c. The Defendant allocated more resources and support to other contractors, thereby creating an uneven playing field and putting Plaintiff at a disadvantage.

209. As a direct result of the Defendant's unfair competitive practices, Plaintiff suffered considerable financial harm and operational disruptions. These included reduced revenues and increased operational costs due to misinformation and lack of support. Additionally, Plaintiff faced difficulty in meeting performance standards and managing day-to-day operations efficiently.

210. The Defendant's actions constitute unfair competition, as they involved deliberate practices aimed at undermining Plaintiff's business operations and

favoring competitors. These actions led to significant financial and operational harm to Plaintiff.

Count VII: Tortious Interference with Prospective Economic Advantage

211. The Plaintiff had a reasonable expectation of entering into future contractual relationships and business opportunities under Network 2.0. This expectation was based on the promises and assurances provided by the Defendant.

212. The Defendant intentionally interfered with Plaintiff's prospective business opportunities by providing false assurances and withholding critical information necessary for Plaintiff to participate in Network 2.0. These actions harmed Plaintiff's chances of securing future contracts.

213. The Defendant's actions were intentional and without justification, specifically designed to harm Plaintiff's business interests and competitive position. By misleading Plaintiff and preventing it from obtaining necessary information, the Defendant obstructed Plaintiff's ability to compete fairly for future business opportunities.

214. Examples of Improper Conduct include the Defendant making false promises regarding Plaintiff's participation in Network 2.0, knowing these promises were untrue. As well as Defendant deliberately withholding critical information needed for Plaintiff to submit a timely Request for Information (RFI) and participate effectively in the Network 2.0 contracting.

215.    As a direct result of the Defendant's interference, Plaintiff suffered significant financial losses and damage to its business reputation. The interference impaired Plaintiff's ability to secure future contracts and maintain its operations, leading to reduced revenue and missed business opportunities. Additionally, the damage to Plaintiff's reputation further hindered its ability to attract new business and partnerships.

216.    The Defendant's actions constitute tortious interference with prospective economic advantage, as they involved intentional and unjustified conduct aimed at disrupting Plaintiff's future business opportunities. These actions caused substantial financial harm and reputational damage to Plaintiff.

Count VIII: Intentional Infliction of Emotional Distress

217.    The Plaintiff had a valid and enforceable contractual relationship with FedEx to deliver packages within specified Contracted Service Areas (CSAs). This relationship was essential to Plaintiff's business operations and revenue.

218.    The Defendant intentionally provided false information about Plaintiff's operations to FedEx management. This misinformation included incorrect data on the dispatch status of Route 2117 and other performance issues. The false information harmed Plaintiff's standing with FedEx, undermining its performance evaluations and contractual stability.

219.   The Defendant failed to provide Plaintiff with critical information necessary for participation in Network 2.0 contracting. Specifically, the Defendant did not give directions on how to participate in the new contracting process and withheld essential details needed for Plaintiff to submit a timely Request for Information (RFI). This omission led to Plaintiff being excluded from consideration for Network 2.0 contracts.

220.   The Defendant intentionally caused route failures by restricting resources needed for loading Plaintiff's vehicles and by supporting discriminatory actions taken by other members of management. These actions were designed to disrupt Plaintiff's operations and create significant operational difficulties.

221.   As a result of the Defendant's interference, Plaintiff faced continuous operational challenges and differential treatment compared to other contractors. These unfair practices led to increased staff turnover, frequent route failures, and an overall decline in operational efficiency. These issues were directly linked to the Defendant's intentional actions and support for discriminatory practices.

222.   The Defendant's interference contributed to Plaintiff's exclusion from being considered for Network 2.0 contracting. By withholding critical information and providing false data, the Defendant ensured that Plaintiff could not compete fairly for new contracts. This exclusion resulted in significant financial losses and damage to Plaintiff's business reputation.

223.    Due to the Defendant's tortious interference, Plaintiff suffered substantial
financial losses and damage to its business. The exclusion from Network 2.0
contracts, combined with the operational difficulties caused by the
Defendant's actions, led to a decline in revenue and business stability.

224.    The Defendant's intentional and malicious actions constitute tortious
interference with Plaintiff's contractual relations with FedEx. These actions
led to significant financial and operational harm to Plaintiff, preventing it
from effectively competing for Network 2.0 contracts and maintaining its
business operations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

a.    For compensatory damages in an amount to be determined at trial for
the financial losses and additional costs incurred by Plaintiff,

b.    For punitive damages in an amount to be determined at trial,

c.    For litigation costs in an amount to be determined at trial, including
but not limited to attorney's fees and court costs,

d.    For a trial by jury on all issues so triable,

e.    For such other and further relief as the Court deems just and proper.

This 5th day of August, 2024.

Respectfully submitted,

By: */s/ Deidre Scott*
*DEIDRE SCOTT*
*Attorney-in-Fact*
*Sister City Logistics, Inc.*

2918 Professional Pkwy.
Augusta, GA 30907
Phone: (762) 257-4197
Fax: (912) 257-7325
E-mail: sistercitylog@gmail.com

🍑 **EFILED IN OFFICE**
CLERK OF STATE COURT
RICHMOND COUNTY, GEORGIA

**2024RCSC01036**
**ASHANTI L. POUNDS**
**AUG 05, 2024 04:57 PM**

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

IN THE STATE COURT OF RICHMOND COUNTY

STATE OF GEORGIA

SISTER CITY LOGISTICS, INC.,

    Plaintiff,

vs.

    CIVIL ACTION FILE NO: _____

JOHN FITZGERALD,

    Defendant.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the **Complaint for Damages and Jury Demand and Plaintiff's First Continuing Interrogatories to Defendant** upon all parties to this matter by depositing a true copy of same in the U.S. Mail, proper postage prepaid, addressed as follows:

John Fitzgerald
347 Bella Rose Drive
Evans, GA 30809

John Fitzgerald
2002 International Blvd.
Augusta, GA 30906

This 5th day of August, 2024.

Respectfully submitted,

By: */s/ Deidre Scott*
   *DEIDRE SCOTT*
   *Attorney-in-Fact*
   *Sister City Logistics, Inc.*

2918 Professional Pkwy.
Augusta, GA 30907
Phone: (762) 257-4197
Fax: (912) 257-7325
E-mail: sistercitylog@gmail.com

⛴ **EFILED IN OFFICE**
CLERK OF STATE COURT
RICHMOND COUNTY, GEORGIA
**2024RCSC01036**
**ASHANTI L. POUNDS**
**AUG 05, 2024 04:57 PM**

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

## IN THE STATE COURT OF RICHMOND COUNTY

## STATE OF GEORGIA

SISTER CITY LOGISTICS, INC.,

     Plaintiff,

vs.

JOHN FITZGERALD,

     Defendant.

CIVIL ACTION FILE NO: _____

---

## PLAINTIFF'S FIRST CONTINUING INTERROGATORIES TO DEFENDANT

Pursuant to O.C.G.A. Section 9-11-33, the Defendant serves the following Interrogatories upon you and requires that you answer these Interrogatories separately and fully in writing, under oath, and serve a copy of your answers to the Defendant within thirty (30) days after service. Where an individual interrogatory calls for an answer which involves more than one part, each part of the answer should be clearly set out so that it is understandable. If any of the Interrogatories cannot be answered in full, please answer to the extent possible and submit any supplemental information as soon as you are able to do so.

If you lack the information necessary to answer any of the Interrogatories, please describe the specific efforts made by you or anyone on your behalf to ascertain the information and state as definitely as possible when you anticipate obtaining the information and supplementing your response.

These Interrogatories are continuing, and if at any time after you have responded to these Interrogatories, any other, further, conflicting, or additional information or document(s) relevant to these Interrogatories, but not previously set forth in your response(s) to said Interrogatories, comes to your knowledge, or comes into your possession or control, then you are requested to further respond and to supplement your response(s) to said Interrogatories within five (5) days from your knowledge or the receipt by you of such additional information or documents, and in any event, prior to any pre-trial conference, trial, hearing, or deposition of any party or witness to this action, and from day to day, and from time to time, and from term to term thereafter, until the cause is finally disposed of.

## DEFINITIONS

1. "Document" means every writing or record of every type and description that is or has been in your possession, custody, or control, or of which you have knowledge, including, but not limited to, correspondence, memoranda, tapes, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, drawings, photographs, films, microfilms, voice recordings, maps, reports, minutes or statistical compilations, or any other reported or graphic

material in whatever form, including copies, drafts, and reproductions. "Document" also refers to any other data compilations from which information can be obtained, and translated, if necessary, by you through computers or detection devices into reasonably usable form.

2. "Person" means any natural person, corporation, partnership, proprietorship, association, governmental entity, agency, group, organization or group of persons.

3. "You" or "your," refers to, without limitation, the Defendant and any and all business entities with which (s)he is or has been affiliated.

4. "Complaint" refers to the Complaint filed by the Plaintiff or counterclaim filed by the Defendant in this action.

5. "Identify" means provide name, address, and phone number of any person, or a complete description of the contents and location of any document.

6. Terms in the singular shall be deemed to include the plural, and terms in the plural shall be deemed to include the singular.

## INTERROGATORIES

1. State your full name, current address, and any other addresses you have resided at in the past ten years.

2. Provide your date of birth and Social Security number.

Employment with FedEx Ground

3. Provide your job title, department, and the dates of your employment with FedEx Ground and/or Federal Express Corporation ("FedEx").

4. List all supervisory or managerial positions you have held with FedEx, including the dates of such positions.

Employment History

5. Provide a detailed description of your educational background, including the names of institutions attended, degrees obtained, and dates of attendance.

6. List all your previous employers for the past twenty years, including the name of the company, location of office, your job title, and the dates of employment.

7. List your spouse's current employer, including the name of the company, location of office, job title, and the dates of employment.

Company Policies and Practices

8. Describe FedEx's policies and procedures related to discrimination, harassment, and retaliation.

9. Provide a copy of any handbook or policy manual on ISP relations in effect during the time period relevant to this lawsuit.

10. State whether you have received any training on discrimination, harassment, and retaliation in the past five years. If so, describe the training and provide dates and attendance records.

Claims Against You

10. State any and all claims made against you during your tenure at FedEx, including but not limited to claims related to Human Resources, EEOC, sexual harassment, unwanted touching, discrimination, racially insensitive comments, and sexual orientation discrimination.

Details of the Alleged Fraud

11. Describe in detail your involvement in the transaction(s) or conduct that is the basis of the fraud allegations in this case.

12. Identify all persons who have knowledge of the facts and circumstances surrounding the alleged fraud.

13. Provide a detailed explanation of any statements you made or documents you created or signed in connection with the alleged fraudulent activity.

14. Specify any financial gain or benefit you received as a result of the alleged fraud.

Details of the Alleged Discrimination

15. Describe in detail your knowledge of the plaintiff's contract with FedEx, including serviced area, domiciled Terminals, and dates of contracts.

16. Identify all persons who have knowledge of the facts and circumstances surrounding the plaintiff's allegations of discrimination.

17. Provide a detailed explanation of any complaints or grievances made by the plaintiff related to discrimination, including the dates, nature of the complaints, and how they were addressed.

Decision-Making Process

18. Identify all individuals involved in the decision-making process related to the adverse action(s) alleged by the plaintiff (exclusion from Network 2.0 Contracting, non-renewal of contract).

19. Describe the criteria and process used to make the decision(s) that the plaintiff alleges were discriminatory.

20. Provide copies of any documents or communications related to the decision-making process.

Comparative Information

21. Identify all ISPs that were domiciled in Terminal 309 and/or Terminal 249 between January 2022 and present..

22. For each such ISP, provide information on their contract status, original date of contracting with FedEx, current contract date, including any disciplinary

actions taken, changes in contracted service area, non-exclusive negotiations, and terminations and the reasons for such actions.

23. Provide a detailed explanation of any differences between the treatment of the plaintiff and these similarly situated ISPs.

Communications and Documentation

24. Provide a list of all communications (emails, letters, phone calls, etc.) you had with the plaintiff or any third parties related to the plaintiff's contract and allegations of discrimination.

25. Identify and describe all documents in your possession, custody, or control that relate to the plaintiff's allegations.

26. If any documents have been lost or destroyed, state the circumstances under which they were lost or destroyed and the contents of such documents.

Investigations and Findings

27. Describe any investigations conducted by FedEx into the plaintiff's allegations of discrimination, including the dates of the investigations, the individuals who conducted the investigations, and the findings and outcomes.

28. Provide copies of any investigation reports or findings related to the plaintiff's allegations.

29. Describe any investigations conducted by FedEx into any allegations of discrimination at Terminal 249 or Terminal 309, including the dates of the

investigations, the individuals who conducted the investigations, and the findings and outcomes.

30. Describe any investigations conducted by FedEx into any allegations of discrimination at any terminal in which you have been employed in the past twenty years, including the dates of the investigations, the individuals who conducted the investigations, and the findings and outcomes.

Financial Information

31. List all assets owned by you, including but not limited to real estate, vehicles, investments, bank accounts, retirement accounts, stocks, bonds, municipal bonds, and cash on hand.

32. List all assets owned by your spouse, including but not limited to real estate, vehicles, investments, bank accounts, retirement accounts, stocks, bonds, municipal bonds, and cash on hand.

33. State your monthly wages from FedEx and any other sources of income.

34. State any companies in which you have business interests and/or ownership.

35. Identify all vehicles owned by you and any vehicles owned by your spouse, including make, model, year, and current market value.

36. Identify any college funds owned by you, including the account balance and beneficiaries of those funds.

37. List all bank accounts owned by you, including joint bank accounts where you have deposited money, and provide the current balance of each account.

38. List all retirement funds owned by you, including the type of account (e.g., 401(k), IRA), the account balance, and the financial institution where the account is held.

39. List all stocks and bonds owned by you, including the name of each stock or bond, the number of shares or units held, and the current market value.

40. List all municipal bonds owned by you, including the issuing municipality, the principal amount, and the current market value.

41. State the amount of cash on hand you currently possess.

42. Identify any trusts in which you are a grantor, trustee, or beneficiary, including the name of the trust, the date established, and the assets held in the trust.

43. List any inheritances you have received or are entitled to receive, including the source, the date received or expected, and the value of the inheritance.

44. Identify any life insurance policies in which you are the owner and/or beneficiary, including the name of the insurer, policy number, coverage amount, and effective dates.

Insurance Information

45. Identify any Errors and Omissions insurance policies you currently hold or have held during the relevant time period, including the name of the insurer, policy number, coverage limits, and effective dates.

46. Identify any umbrella insurance policies you currently hold or have held during the relevant time period, including the name of the insurer, policy number, coverage limits, and effective dates.

Defenses and Counterclaims

47. State all facts upon which you base any defenses to the allegations in the complaint.

48. Identify any counterclaims you intend to assert against the plaintiff, including the factual basis for such counterclaims.

Third-Party Involvement

49. Identify any third parties who were involved in the transactions or events that are the subject of this lawsuit.

50. Describe any role these third parties played in the alleged fraudulent activity.

Prior Knowledge and Intent

51. State whether you had prior knowledge of the plaintiff's allegations before this lawsuit was filed.

52. Describe any actions you took to prevent or mitigate the alleged fraudulent activity.

Damages

53. State whether you are aware of any financial or operational harm suffered by Plaintiff as a result of your actions and describe your knowledge in detail.

54. Identify any documents or records in your possession that relate to the financial performance or operational status of Plaintiff.

55. Describe any steps you took to mitigate any potential harm to Plaintiff as a result of your actions.

Remedial Actions

56. Describe any remedial actions taken by FedEx in response to the plaintiff's allegations of discrimination.

57. Provide information on any changes to company policies or practices made as a result of the plaintiff's complaints.

Other Relevant Information

58. Identify all documents that you reviewed, referred to, or relied upon in preparing your responses to these interrogatories.

59. Identify any individuals with knowledge of the facts alleged in the complaint and describe the nature of their knowledge.

60. Describe any other actions or decisions you made that may be relevant to the claims or defenses in this lawsuit.

Contact Information

61. State your full name, current address, telephone number, and email address.

Specific Allegations

62. Detail your responsibilities and oversight of SCL's operations at Terminal 309 and Terminal 249.

63. Identify and describe all communications you had with Justin Williams and other FedEx employees regarding Plaintiff and Deidre Scott from January 1, 2024, to the present.

64. Explain in detail your understanding of the allegations that you falsified performance numbers for Plaintiff, including any documents or data you used to report these numbers.

65. Describe any instances where you shared information with Kevin Toelle or other contractors prior to its disclosure to Ms. Scott, including the nature of the information shared and the reasons for sharing it.

66. Provide details of any communications or actions you took to coordinate with Marlon Campbell regarding the acquisition of the CSA 308002.

67. Provide details of any communications or actions you took to coordinate with Marlon Campbell to restrict or delete posts on social media.

68. Provide details of any documented communications or actions that demonstrate deceit and false assurances given to Ms. Scott, including emails, text messages, and phone calls from May 1st, 2024, to July 26, 2024.

69. Describe any selective dissemination of information to other contractors, including the nature of the information shared, the recipients, and the reasons for sharing it.

70. Detail any instances where SCL was excluded from critical meetings, including the reasons for such exclusions and the individuals involved in these decisions.

71. Explain the process for posting and selecting contractors for the undefined service area in Augusta, Georgia, listed on June 5, 2024, and describe your involvement in this process.

72. Describe any communications or actions related to Ms. Scott's attempts to explore the sale of SCL's routes, including any assurances or statements made to her and the reasons for providing such assurances.

73. Describe any complaints or investigations related to your management practices and alleged creation of a hostile environment, particularly against women and minorities.

Document Requests

76. Identify all documents, emails, text messages, and other records in your possession or control that are related to the allegations in Plaintiff's complaint, including but not limited to communications with FedEx employees, other contractors, and internal reports or analyses.

## **INSTRUCTIONS FOR THE DEFENDANT**

77. **Answer Format:** Each interrogatory must be answered separately and fully in writing under oath unless it is objected to, in which event the reasons for the objection must be stated in lieu of an answer.

78. **Deadline for Response:** The responses must be served upon the plaintiff within 30 days of receipt of these interrogatories.

79. **Signatures:** The answers must be signed by the person making them and the objections must be signed by the attorney making them.

80. **Continuing Duty:** These interrogatories are continuing in nature, requiring the defendant to provide supplemental responses if further information is obtained.

This 5th day of August, 2024.

Respectfully submitted,

By: */s/ Deidre Scott*
   *DEIDRE SCOTT*
   *Attorney-in-Fact*
   *Sister City Logistics, Inc.*

2918 Professional Pkwy.
Augusta, GA 30907
Phone: (762) 257-4197
Fax: (912) 257-7325
E-mail: sistercitylog@gmail.com

# STATE COURT OF RICHMOND COUNTY
# STATE OF GEORGIA

**EFILED IN OFFICE**
CLERK OF STATE COURT
RICHMOND COUNTY, GEORGIA
**2024RCSC01036**
**ASHANTI L. POUNDS**
**AUG 05, 2024 04:57 PM**

Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

CIVIL ACTION NUMBER   2024RCSC01036

Sister City Logistics, Inc

---

**PLAINTIFF**

**VS.**

Fitzgerald, John

---

**DEFENDANT**

## SUMMONS

TO: FITZGERALD, JOHN

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Deidre Scott**

**2918 Professional Parkway**
**Augusta, Georgia 30907**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 5th day of August, 2024.**

Clerk of State Court

Hattie Holmes Sullivan, Clerk
Richmond County, Georgia